IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| OSRAM SYLVANIA PRODUCTS INC., | : |
| Plaintiff, | : CIVIL ACTION NO. 3:CV-07-0865 |
| v. | : |
| | : (JUDGE CAPUTO) |
| TIBERON MINERALS LTD, ET AL., | : |
| Defendants. | : |

## **MEMORANDUM**

Before me is Plaintiff's Motion for Expedited Discovery. (Doc. 3.) Because the two agreements entered into between the parties require arbitration, the Court must stay proceedings, as is mandatory under the Federal Arbitration Act, 9 U.S.C. § 3. Thus, the Court cannot order the discovery relief Plaintiff requests.

## **FACTS**

Plaintiff Osram Sylvania Products Inc. ("Sylvania") filed a Complaint in this Court on May 11, 2007. (Doc. 1.) Therein, Sylvania alleges that, on May 16, 2005, it entered into two (2) agreements[1] with Defendants Tiberon Minerals, Ltd. ("Tiberon") and Nui Phao Mining Joint Venture Company Limited ("Nui Phao")[2] concerning the supply of tungsten ore[3] from a mine that is being developed in northern Vietnam. (Doc. 1 ¶¶ 22, 29.) Tungsten ore is very difficult to acquire, and the mine is one of a very limited

---

[1] One of these agreements was an option agreement, which Sylvania exercised on February 20, 2006. (Doc. 1 ¶ 29.)

[2] Tiberon holds a controlling seventy percent (70%) ownership stake in Nui Phao. (Doc. 1 ¶ 20.)

[3] Tungsten is a chemical element used in a variety of applications, most notably in lightbulb filaments. (Doc. 1 ¶ 14.)

number of sources for tungsten ore. (Doc. 1 ¶¶ 15-16.)[4]

Pursuant to the agreements, Sylvania has the specific and enforceable right to purchase up to one hundred percent (100%) of the tungsten ore produced by the mine during the ten (10) to fifteen (15) year term of the agreements. (Doc. 1 ¶ 31.) In order to assure Sylvania that it could rely on the mine to supply its tungsten ore needs, both agreements prohibit Nui Phao from selling any tungsten produced by the mine to any person or entity other than Sylvania is such a sale would impede Nui Phao's ability to sell and deliver the tungsten ore to Sylvania. (Doc. 1 ¶ 36.)[5] Sylvania agreed to make this long-term commitment to purchase tungsten ore from the mine once it was completed so that Nui Phao and Tiberon would be able to secure financing from institutional lenders. (Doc. 1 ¶ 32.) Sylvania, in reliance on the agreements, entered into an agreement with Sandvik AB and its affiliates to supply them with tungsten oxide, which would be produced by Sylvania from tungsten ore supplied by the mine. (Pl.'s Br. In Supp. at 4, Doc. 4 at 4.)

By September 2006, Tiberon and Nui Phao had announced that they had secured three hundred nineteen million dollars ($319,000,000) in financing, surpassing the required financing amount of two hundred twenty nine million eight hundred thousand dollars ($229,800,000) as defined by the agreements, as well as the latest capital cost estimate of three hundred two million dollars ($302,000,000). (Doc. 1 ¶¶ 39-54.)

---

[4] The world's largest deposits of tungsten ore are found in China, which, until 2000, provided eighty percent (80%) of the world's supply. (Doc. 1 ¶ 16.) In 2000, China prohibited the exportation of tungsten ore. (*Id.*)

[5] Tiberon, as the corporate parent of Nui Phao, agreed to take all action as required to cause Nui Phao to fully and timely perform all obligations under the agreements. (Doc. 1 ¶ 34.) Without this separate commitment of Tiberon, Sylvania would not have entered into these agreements. (Doc. 1 ¶ 35.)

2

In October 2006, Sylvania learned that Dragon Capital Management Limited ("Dragon") had made overtures towards Tiberon and had even entered into discussions with it regarding a possible acquisition. (Doc. 1 ¶¶ 55-59.)  Tiberon also received acquisition bids from other companies. (*Id.*)[6]

On December 19, 2006, Tiberon announced that it had signed a pre-acquisition agreement with Dragon and three (3) investment funds managed by Dragon: Vietnam Enterprise Investments Limited, Vietnam Growth Fund Limited, and Vietnam Dragon Fund Limited (the " VEIL Funds"). (Doc. 1 ¶ 61.)  Pursuant to the pre-acquisition agreement, the VEIL Funds offered to acquire all of the issued and outstanding shares of Tiberon for cash. (*Id.*)  Sylvania alleges that the pre-acquisition agreement between Dragon and Tiberon included a provision prohibiting Nui Phao and Tiberon from incurring any debt or issuing any equity securities without Dragon's consent, until Dragon appointed its own persons to the Tiberon board of directors after the completion of the acquisition. (Doc. 1 ¶ 62.)[7]

Nui Phao and Tiberon failed to close on the bank financing.

On February 12, 2007, Dragon announced that the VEIL Funds' offer, presented through TML Acquisition Ltd. ("TML"),[8] had been accepted by the owners of ninety-three

---

[6]On December 8, 2006, John Shrimpton, managing director of Dragon, telephoned Sylvania management in Towanda, Pennsylvania, and asked them to encourage Tiberon to favor Dragon's bid to acquire Tiberon over any other bid. (Doc. 1 ¶ 60.)  Shrimpton stated that Sylvania's involvement in the mine was important to Dragon. (*Id.*)  He also emphasized that Dragon intended to retain the current Tiberon and Nui Phao management in the event that Dragon's bid to purchase Tiberon was successful. (*Id.*)

[7]Also on December 19, 2006, Tiberon management called Sylvania management in Towanda, Pennsylvania, to discuss the Dragon takeover and assured Sylvania that Tiberon management would remain in place. (Doc. 1 ¶ 63.)  Tiberon management did not mention the financing restrictions imposed by the pre-acquisition agreement. (*Id.*)

[8]TML is a British Columbia corporation organized by Dragon. (*See* Doc. 4 at 6.)

3

percent (93%) of the outstanding Tiberon common shares. (Doc. 1 ¶ 66.)

On April 25, 2007, Nui Phao provided letters to Sylvania purporting to give formal notice of termination of the agreements on the basis that the required financing had not been obtained. (Doc. 1 ¶ 74.)

Sylvania seeks a declaratory judgment that the required financing amount as defined by the agreements was obtained by Nui Phao and Tiberon, and, therefore, they did not have the right to terminate the tungsten supply agreements on that basis. (Doc. 1 ¶¶ 86-94.) Sylvania also seeks specific performance of the agreements (Doc. 1 ¶¶ 95-102), as well as preliminary and permanent injunctive relief to enjoin the sale or attempted sale of tungsten ore to third parties and to preserve the assets, books and records of Tiberon and Nui Phao. (Doc. 1 ¶¶ 103-107.) Sylvania also set forth a cause of action against Dragon for tortious interference of contract. (Doc. 1 ¶¶ 108-114.)

Sylvania requests that it be permitted to conduct limited and expedited discovery for the purpose of determining the status of the mine's development and financing, as well as whether Nui Phao and Tiberon have made any sales, or entered into negotiations regarding sales, of tungsten ore which was extracted from the mine. (Doc. 3.) Sylvania alleges that it will be significantly and irreparably harmed if Nui Phao and Tiberon do not abide by the terms of the tungsten supply agreements. (*Id.*)

## DISCUSSION

In my view, this matter turns on the arbitration clause which is contained in the agreements which are at the center of this controversy.  Paragraph 16 provides:

16.  DISPUTES AND ARBITRATION

> 16.1 Except as otherwise provided in this Agreement, unresolved disputes under this Agreement will be resolved in accordance with this Section 16.   The Parties agree to

4

>   attempt to settle all disputes amicably and in good faith. If settlement is not reached, the dispute in question shall be submitted to and resolved by binding arbitration in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce 2000. The place of arbitration shall be in Toronto, Canada. Except as otherwise provided herein, a demand for arbitration shall be made by any Party within a reasonable time after a dispute in question has arisen, and in no event after the date when institution of legal proceedings, based on such dispute, would be barred by applicable statues of limitations. The arbitrators shall be instructed to render a decision within sixty (60) days after selection and shall be required to state in writing the reasoning on which the decision and any award rests. The arbitrators shall have the power to award counsel fees and expenses, as well as dispute resolution costs (including any fee for the arbitrators), to the prevailing party. Judgment upon the award rendered may be entered in any court having jurisdiction or application may be made to such court for a judicial acceptance of the award and an order of enforcement, as the case may be. The arbitrators shall not award any consequential, incidental, indirect, special, punitive or exemplary damages hereunder or in connection herewith. <u>Nothing contained in this Section shall prohibit or limit any Party from seeking and obtaining equitable relief (including without limitation, temporary restraining orders and preliminary and permanent injunctions or stays) to which it would otherwise be entitled from a court of competent jurisdiction</u>. Absent an award by the arbitrator, each Party shall be responsible for and pay their own costs (including without limitation attorneys fees) incurred from arbitration. The language utilized in connection with any arbitration shall be English. The arbitrators ruling shall be final and binding on both parties and non-appealable. (emphasis added)

The Defendant asserts that the arbitration clause covers unresolved disputes under the Agreement, that this is such a dispute, and that it should be resolved by arbitration including any demand by Plaintiff for injunctive or other equitable relief (specific performance).

Plaintiff argues that the granting of such equitable relief is "carved out" of the jurisdiction of the arbitrators, and therefore, arbitrators have no authority to grant equitable relief. Plaintiff argues that it is therefore entitled to seek such relief in this Court.

The operative word in the sentence emphasized above is "otherwise". It communicates that relief (equitable) which is otherwise granted by a court of competent jurisdiction can be granted by arbitrators. The word "otherwise" would otherwise be unnecessary, as the sentence could easily have said "Nothing . . . shall prohibit any Party from seeking equitable relief from a court of competent jurisdiction." The sentence clearly communicates that the arbitrator can grant the relief that would otherwise be granted by a court. Stated another way, the arbitrators can grant relief which, under different or other circumstances, would be granted by a court.

Moreover, the sentence which immediately precedes the emphasized sentence describes relief that the arbitrators may not grant, viz "consequential , incidental, indirect, special, punitive or exemplary damages . . ." This sentence and the one which is emphasized when read together in context reinforce the most sensible construction, viz that the arbitrators can grant equitable relief.

Therefore, concluding that this matter is arbitrable and that arbitrators under the Agreement can grant the relief sought by Plaintiffs, this Court will stay this case until such arbitration is final and complete. Plaintiff's Motion for Expedited Discovery will, therefore, be denied.

An appropriate Order follows.

Date: June 22, 2007                 /s/ A. Richard Caputo
                                    A. Richard Caputo
                                    United States District Judge

6

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| OSRAM SYLVANIA PRODUCTS INC., | : |
| Plaintiff, | : CIVIL ACTION NO. 3:CV-07-0865 |
| v. | : |
| | : (JUDGE CAPUTO) |
| TIBERON MINERALS LTD, ET AL., | : |
| Defendants. | : |

## **ORDER**

**NOW**, this 22nd day of June, 2007, **IT IS HEREBY ORDERED** that this case is stayed until arbitration is final and complete, and Plaintiff's Motion for Expedited Discovery (Doc. 3) is **DENIED**.

/s/ A. Richard Caputo
A. Richard Caputo
United States District Judge